## Case No. 13,971.

### THOMPSON et al. v. The OAKLAND.

[4 Law Rep. 349.]

District Court, D. Massachusetts. Nov., 1841.

SEAMEN—SHIPPING ARTICLES—PAROL AGREEMENT —COMPLETION OF VOYAGE—WAGES AS COMPENSATION.

1. Shipping articles described the voyage to be from Boston to one or more ports south, thence to one or more ports in Europe, and back to a port of discharge in the United States: *Held*, that the description was sufficiently certain to bind the parties to the performance of the voyage.

2. A parol understanding that the vessel was not to complete the voyage described in the shipping articles, is not admissible.

3. Inability to obtain freight is not such a necessity as absolves the owner from his contract to perform the voyage described in the articles.

4. Where owners refused to perform the voyage to Europe, and the ship returned with the seamen on board to the home port, a sum equal to one month's wages was allowed to each seaman as compensation for the loss of the voyage to Europe.

In admiralty.

R. H. Dana, Jr., for libellants.
Wm. Dehon, for respondents.

SPRAGUE, District Judge. The libellants were mariners on board the ship. The voyage, as described in the shipping articles, was "from Boston to one or more ports south, thence to one or more ports in Europe, and back to a port of discharge in the United States." They sailed from Boston on the 21st of June, and arrived in Hampton Roads about the 3d of July. The captain proceeded to Petersburg, and endeavored to obtain freight for Europe. He also, by correspondence, made inquiries at Charleston, Savannah, and Mobile, but did not succeed in obtaining business. About the 7th of August the captain determined to return to Boston, and on that day the whole crew went aft and inquired of the captain whether he meant to get other men in the place of those (four or five in number) who had been discharged from sickness. He replied, no; that, as the ship would return to Boston, he did not intend to procure other hands. They then asked for their discharge, saying they thought the articles broken by not going to Europe. The captain refused to discharge any of them, and declared that they should all return with him to Boston. They were then ordered by the mate to go to work, and they obeyed. On the next day (the 8th of August), the ship sailed for Boston, and arrived on the 14th. The crew were discharged the same day. The libellants were paid their wages, at the rates stipulated in the articles, up to the time of their discharge. They now claim compensation for the loss of the voyage to Europe, and for being refused their discharge at James river.

To this claim it is objected on the part of the respondents—first, that the articles are not obligatory, because it is said that the voyage is not sufficiently described; that there is no description of ports, no prescribed terminus, and no limitation of time. It is argued that the articles admit of any number of voyages between ports south, and then between ports in Europe. To this the libellants' counsel replies, that the fair understanding of the articles is, that the ports south shall be visited only for the purposes of the European voyage, and the ports in Europe only for the purposes of the home voyage. This, I think, is the true interpretation, and makes the voyage sufficiently definite to be obligatory upon the parties. In Brown v. Jones [Case No. 2,017], cited for the libellants, the voyage described was "from the port of Boston to the Pacific, Indian, and Chinese Oceans and elsewhere, and on a trading voyage, and from thence to Boston." There no ports were designated, nor any time limited, yet it was held that the oceans must be visited in the order in which they were mentioned, and wages were decreed to the crew, who deserted the vessel at Canton, whence she was about to return to the north-west coast. In the case of The Saratoga [Id. 12,355], the voyage described was "from Boston to Amelia Island, at and from thence to port or ports in Europe, and at and from thence to her port of discharge in the United States." The suit was for wages, and was zealously defended by most eminent counsel, yet no question was made, either by counsel or by the court, of the sufficiency of the description of the voyage. In the case of The Crusader [Id. 3,456], which has been pressed upon the court by the counsel for the respondent, there were no written articles, and the vessel was to be employed in the coasting trade, from place to place, without any limitation of time or restriction of places. If this contract was obligatory, it would bind the libellant to perpetual service, at the will of the master; while, on the other hand, the master might terminate it at pleasure, by giving up the trade, and there was therefore no mutuality. On these grounds the court was of opinion, that the libellant might terminate the contract at any reason-

able time and place. The difference between that case and the present is manifest.

The next ground taken in the defense is, that it is the usage of the port of Boston for ships which go south in search of freight for Europe to return, if freight cannot be obtained. Without pausing to inquire how far a usage of any port can vary the written articles so carefully prescribed by acts of congress, it is sufficient that no usage has been proved which can affect the present case. Respectable ship owners have testified that they have long been engaged in this trade, and that they know of constant instances of vessels returning when they fail of procuring freight, and that they never knew an instance of a claim for compensation for the loss of the voyage to Europe. They admitted, however, that the original crews very seldom returned in the vessels; and we have, moreover, no evidence that the articles did not in those cases, provide for the return to Boston.

The next objection is, that there was, in this case, an understanding between the libellants and the owner that the vessel might return, and that some of the libellants received additional advance in consideration of this chance. This is not sufficiently proved, and even if the evidence of it were much stronger than it is, it would not be permitted to control the written articles. This would be inconsistent with well-established principles of law, and with the statutes of the United States, which have sought with much solicitude to give to seamen the protection of a written contract. Act, 1840 [Langtree's Ed.] c. 23, § 3 [5 Stat. 395, c. 48].

It is further contended, that the voyage was abandoned from necessity, because freight for Europe could not be obtained. It is replied on behalf of the libellants, that this is not the kind of necessity which will excuse the owner from performing his contract; that it must be vis major, or an inevitable, overpowering necessity; in the nature of a common calamity; while this is a mere contingency in trade, one very likely to occur, and which could have been foreseen and provided for in the contract. The only authority adduced for the respondents' view is a remark of Sir Christopher Robinson, in giving his opinion in the case of The Cambridge, 2 Hag. Adm. 247, in which he says that he finds in Sir Edward Simpson's notes, cases in which the necessity of going to St. Petersburg for a cargo which the master had been disappointed in obtaining at Hamburg, and detentions arising from the stress of weather, or the order of the government, have been held not to be deviations amounting to a breach of the mariner's contract, such as would entitle them to their discharge. The terms of the contract do not appear, and they are most material to be known, in order to understand a question of mere deviation, as that was; or are we enlightened by any particulars of the case or reasons of the court. On the other hand, Sir John Nicholl states that very case of inability to obtain freight as not discharging the owner from his contract with the mariners: "A mariner, it is true, may be entitled to wages, even if no freight is earned, as when a vessel is sent out on a seeking voyage, in search of freight, and obtains none." The Lady Durham, 3 Hag. Adm. 202. In the case of The Mary [Case No. 9,186], the mariners shipped for a voyage from New York to New Orleans and back to New York or such other port as the ship might take freight for. Freight was earned to New Orleans, but the ship remained there a year without obtaining freight for any other port, and then the master discharged the seamen. It was contended, that, as the ship did not earn freight after her arrival at New Orleans, the crew were not entitled to wages; but the court gave them wages for the whole time the vessel lay at New Orleans, and up to the time of their return to New York.[1]

The only remaining question is the amount of compensation to be awarded. This is governed by no fixed rule. The court is to give as much as, under the circumstances of the case, it shall deem proper. There is nothing in the conduct of the owner that calls for exemplary damages. There has been no wanton violation of the contract, and the men have been brought to a home port and paid their wages to the time of their discharge. He has also made some offer of additional compensation. On the other hand, the conduct of the libellants has been exemplary. When their requests to be discharged were refused, they went quietly back to their work, and faithfully performed their duty until discharged. In a case in which the voyage was broken up at the home port, Judge Peters allowed one month's pay in addition to the wages actually earned. What the voyage was, and where begun is not stated. Woolf v. The Oder [Case No. 18,027]. The same judge in Hindman v. Shaw [Id. 6,514], says that in voyages broken up in the West Indies, or distant ports in the United States, he has given seamen one month's pay, although this has been sometimes refused.

On the whole, I am of opinion that the libellants are entitled to one month's pay each, as damages, and to the costs.

_____

THOMPSON (OTTERIDGE v.). See Case No. 10,618.

_____

[1] In addition to 3 Hag. Adm. 202, and The Mary [supra], the counsel for the libellant cited, to this point, The Saratoga [supra]; Curt. Merch. Seam. 295; and 1 Hag. Adm. 347.